705 So.2d 1324 (1997)
Bobby Allen RALEIGH, Appellant,
v.
STATE of Florida, Appellee.
No. 87584.
Supreme Court of Florida.
November 13, 1997.
Rehearing Denied February 19, 1998.
*1326 James B. Gibson, Public Defender and Michael S. Becker, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, for Appellant.
Robert A. Butterworth, Attorney General and Mark S. Dunn, Assistant Attorney General, Tallahassee, for Appellee.
PER CURIAM.
We have on appeal the sentence of death imposed upon Bobby Allen Raleigh entered upon a plea of guilty to first-degree murder. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
In the early morning hours of June 5, 1994, while at the Club Europe in DeLand, Domingo Figueroa told Raleigh that someone had slapped his mother. Raleigh and Figueroa confronted Douglas Cox and his brother and while they were talking in the parking lot, Raleigh's mother ran out of the bar screaming at Cox. Raleigh took his mother to the car and returned to confront Cox. After apologizing for his mother's actions and shaking hands with Cox, Raleigh obtained guns from his home. Raleigh and Figueroa then drove to Cox's trailer.
Raleigh went to the door with a gun in his hand and was told by Ronald Baker that Cox was asleep. Raleigh and Figueroa left, drove down a nearby dirt road, parked, and later returned to Cox's trailer carrying guns. Raleigh walked to the end of the trailer and shot Cox in the head three times at close range. Figueroa and Raleigh shot Tim Eberlin, Cox's roommate, until their guns jammed. Raleigh then beat Eberlin in the head with the barrel of the gun until he stopped screaming. Raleigh and Figueroa drove to Raleigh's home where they burned the clothes they wore during the murders, dumped the bullets into a neighbor's yard, and later hid the guns in a secret compartment in Raleigh's Subaru. The police went to Raleigh's house that night and he agreed to talk to them. Raleigh initially denied his involvement in the murders, but after being told that Figueroa had implicated him, he taped a second statement admitting that he killed Cox and Eberlin.
On June 6, 1995, Raleigh pled guilty to two counts of firstdegree murder and the penalty phase was conducted from August 8 to August 15, 1995. A jury unanimously recommended the death penalty on each count. On February 16, 1996, the trial court sentenced Raleigh to death, finding that the *1327 aggravating circumstances,[1] outweighed the one statutory mitigating circumstance,[2] and several nonstatutory mitigating circumstances.[3] Fourteen issues are raised on appeal.[4]
Raleigh first argues that the trial court erred in failing to instruct the jury on the "no significant history of prior criminal activity" statutory mitigator. He maintains that he had no criminal arrests or convictions and that although he was involved in drug dealing, his role was minor. We disagree.
The record shows that Raleigh himself confessed to extensive drug dealing and drug use. He admitted that at age seventeen or eighteen he bought "acid" from Cox; that he sold drugs with Garret Lennon until Lennon "ripped him off'; that after Figueroa's arrest in Ocala for carrying thirty pounds of marijuana, he helped Figueroa's wife hide 100 pounds of marijuana under her house and then dug it up so it could be disposed of quickly; that he sold drugs for Figueroa; that he stole Lennon's drug customers; that he ran ten pounds of marijuana to Virginia every two weeks (Figueroa advanced him the marijuana and he returned with the cash); that he was partners with his cousin, David Vanover, who bought a Subaru and created a hidden compartment so that Raleigh could transport more marijuana per trip; that at Club Europe prior to the murders, Raleigh approached Lennon to buy cocaine; and that he "took acid, huffed freon, used cocaine, and took sleeping pills." Further, Raleigh told Dr. James Upson (defense's mental health expert) that he became involved with drugs in high school; that there was more money dealing in drugs than working; and that he was expanding his drug business. Competent substantial evidence supports the trial court's refusal to give the instruction on "no significant history of prior criminal activity." We find no error.
Raleigh next argues that there was no evidentiary basis for the trial court to instruct the jury that it could consider the "pecuniary gain" aggravating circumstance, as evidenced by the court's rejection of the circumstance. We disagree. In Bowden v. State, 588 So.2d 225 (Fla.1991), we stated:
The fact that the state did not prove this aggravating factor to the trial court's satisfaction does not require a conclusion that there was insufficient evidence of a robbery to allow the jury to consider the factor. Where, as here, evidence of a mitigating or aggravating factor has been presented *1328 to the jury, an instruction on the factor is required.
Id. at 231.
In the instant case, Patricia Pendarvis testified that Raleigh commented to her and others that "everything was all about making money." Joseph Miller testified that earlier in the year, he heard Raleigh ask Cox to give up part of his drug business. When Cox called him crazy, Raleigh answered, "One day or other I'm going to take over your business anyway even if I have to kick your ass." Miller testified that when he bought "acid" from Raleigh another time at Club Europe, Raleigh commented that Cox was being selfish about his drug trade and said, "It doesn't matter anyway. I am either going to kick his ass or I'm going to kill him, one or the other." Miller also testified that Raleigh hated the fact that Cox made more money than he and said, "It's the money thing is what it was." This evidence is sufficient to support the trial court's instruction. We find no error.
We also reject Raleigh's claim that the trial court abused its discretion by dismissing juror Chandler without cause over defense objection. After the charge conference, the state moved to replace juror Chandler with one of the alternates because he expressed hostility towards Assistant State Attorney Sean Daly. Specifically, Chandler commented, "Sit down dummy, shut up," during Daly's cross-examination of Raleigh, and, "Oh shit," during the cross-examination of Dr. James Upson. The trial court interpreted the comments to be an expression of Chandler's frustration with the proceedings rather than an expression of hostility toward Sean Daly and concluded that there was not enough justification to remove Chandler. A short time later the state renewed its motion to have Chandler removed on the grounds that the clerk heard him say in the break room that he did not like the way Daly handled himself and thought his actions were inappropriate. Chandler admitted that he expressed the opinion, but felt that his frustration with Daly would not influence his ability to reach an unbiased decision. The trial court granted the state's motion on the basis of Chandler's comments. We are bound to follow the trial court's ruling absent an abuse of discretion. Because reasonable persons could agree with the trial court's ruling,[5] we find no abuse of discretion and thus no error.
Next, Raleigh argues that the court erred in finding several aggravating circumstances. He claims that the state failed to prove each beyond a reasonable doubt. In Willacy v. State, 696 So.2d 693 (Fla.), cert. denied, ___, U.S. ___, 118 S.Ct. 419, 139 L.Ed.2d 321 (1997), we stated:
[I]t is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt  that is the trial court's job. Rather, our task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.
Id. (footnote omitted).
Raleigh claims that the court erred in finding that the murders were committed during the course of a burglary. We disagree. The trial court found that each murder
did occur during a burglary. The Defendant entered the locked trailer, at night, armed with a loaded pistol, with the intent to commit murder. If Defendant initially gained entrance with Eberlin's permission it was through false pretense; and any permission was certainly withdrawn when Defendant shot Cox three times in the head and remained in the trailer to kill Tim Eberlin.
The court applied the right rule of law,[6] and competent substantial evidence supports its *1329 finding. There is ample circumstantial evidence from which the jury could conclude that Eberlin withdrew whatever consent he may have given for Raleigh to remain when Raleigh shot him several times and beat him so viciously that his gun was left bent, broken, and bloody. We find no error.[7]
Raleigh contends that the court erred in finding that he murdered Eberlin to avoid arrest. He claims that his actions were instinctive rather than evincing a careful plan to eliminate Eberlin as a witness. We disagree. The trial court found that
[t]he dominant motive for the murder of Eberlin was witness elimination (see Correll v. State, 523 So.2d 562 (Fla.1988)). He knew the Defendant was seeking out Cox, saw the Defendant go towards Cox, then heard the shots. He knew what happened and who did it. Additionally, there was no evidence Eberlin, unlike Cox, was involved in the drug trade or caused the earlier incident at the Club Europe. So the only reason for the murder of Eberlin was witness elimination.
The court applied the right rule of law,[8] and competent substantial evidence supports its finding. We find no error.
Raleigh argues that the court erred in finding the CCP aggravator for Cox's murder. We disagree. The trial court found the following regarding the CCP aggravator:
Before the murders the Defendant and co-Defendant drove to Raleigh's house to obtain the handguns. They then drove a distance to Cox's trailer that was located in a rural area down an unlighted dirt road. Raleigh had to show Figueroa where the trailer was located. On the dirt road they bumped into Pendarvis and Chalkley. The Defendant first tried to conceal something. Shortly after that he came out of the car with his hands up. Then he proceeds, armed with a 9MM, to the trailer for the first time. He meets Baker and displays the loaded 9MM. On the way back from the trailer, going towards the road, the Defendant tells Baker he should "pump a couple of caps at them" (at Pendarvis and Chalkley). After Baker, Pendarvis, and Chalkley leave the Defendant doubles back and enters the locked trailer. He executes a sleeping Cox, then eliminates Eberlin. For the fourth time that night he leaps the fence (See State # 2) and leaves. He and the Co-Defendant then burn their clothes, hide the guns in a secret compartment, and dump bullets in a neighbor's yard.
These facts clearly establish a cold, calculated and premeditated murder. There was ample time to reflect. There was opportunity to abandon the plan, especially when Defendant first left with Baker. Instead the Defendant doubled back and went to the trailer a second time. There is no doubt but that the Defendant had a prearranged plan to go to Cox's trailer and murder him.
The court applied the right rule of law,[9] and competent substantial evidence supports its finding. We find no error.
Raleigh claims that the court erred by finding that Eberlin's murder was heinous, atrocious, or cruel. We disagree. The court's finding depicts Eberlin's terror:
This aggravator was established by the evidence. Raleigh returned from killing Cox then shot a screaming Eberlin several times. Raleigh's gun jammed, and Eberlin kept screaming. Eberlin cowered in a corner trying to escape. Raleigh then savagely beat Eberlin in the head with the barrel of the 9MM (see State Exhibits 47-49). This beating occurred while Eberlin was still alive. The beating was so savage *1330 that the barrel penetrated Eberlin's skull (see State Exhibit 50). Timothy Eberlin's killing was pitiless, shockingly evil, and unnecessarily torturous.
The court applied the right rule of law,[10] and competent substantial evidence supports its finding. We find no error.
Raleigh next argues that the trial court erred by rejecting the "substantial domination" and "no significant history of prior criminal activity" statutory mitigators. We disagree. In Blanco v. State, 706 So.2d 7 (Fla.1997), we stated that "whether a mitigating circumstance has been established by the evidence in a given case is a question of fact and subject to the competent substantial evidence standard." Id. at 10.
Because we find no error in the court's refusal to instruct the jury on the "no significant history of prior criminal activity" mitigator, we find no merit to this claim. As to the "substantial domination" mitigator, the court found that it was not established:
The defense contends the Defendant was under the domination of his Co-Defendant and cousin, Domingo Figueroa. They presented some evidence that Raleigh was a follower, he looked up to the older Figueroa, and that Figueroa was the dominant drug dealer.
The Court does not find this statutory mitigator to have been reasonably established. Looking to the murders, it was Raleigh and Raleigh alone who killed Cox in his sleep. It was Raleigh who finished off Eberlin at close range. It was also Raleigh, not Figueroa, who went to the trailer, the first time with a 9MM. Raleigh was the principal perpetrator during the two murders. Finally, the evidence indicated it was Raleigh, not Figueroa, who may have wanted a piece of Cox's drug trade.
The record contains competent substantial evidence to support the trial court's conclusion. We find no error.
Raleigh next asserts that the trial court erred in failing to assign sufficient weight to several of his proposed nonstatutory mitigating circumstances (Raleigh's remorse, cooperation with authorities, and voluntary intoxication). We disagree. The weight assigned to a mitigating circumstance is within the trial court's discretion and subject to the abuse of discretion standard. Blanco, 706 So.2d at 10.
The court found that Raleigh was remorseful for the killings, but also stated:
This Court finds the plea of guilty and offer to testify against the Co-Defendant to be the most significant and the most mitigating. On the other hand, the Defendant may be remorseful now, but he was not remorseful or cooperative on the day following the murders.
Raleigh admitted that after Lennon informed him that Cox was dead, he called Figueroa instead of police. Later, he called Vanover, his drug partner in Virginia, to let him know he shot somebody. He then hid the murder weapons to prevent the police from finding them. Raleigh did not volunteer information until Figueroa implicated him in the murders, and even then, Investigator Horzepa testified that Raleigh was not forthcoming with his account of what happened. We find no abuse of discretion as to the weight attributed to the remorse and cooperation mitigators. See Huff v. State, 569 So.2d at 1249.
The trial court assigned little weight to the voluntary intoxication mitigator based on Raleigh's actions the morning of the murders. The court explained its reasons in its rejection of the "under the influence of extreme mental or emotional disturbance" mitigator:
There is no doubt that Raleigh consumed a great deal of alcohol before the murders. This Court cannot find, however, that his condition was "extreme". He acted too purposefully and competently in getting the guns, going to the trailer, doubling back after encountering Baker, et al, in *1331 executing Cox, physically beating Eberlin, and in disposing of evidence afterwards. If Raleigh was under extreme mental or emotional disturbance he would not have been able to accomplish all this. Also, witnesses said while Raleigh was under the influence he was coherent, could carry on a conversation, had no trouble walking, and had no trouble climbing the fence. Finally, the Defendant himself admitted he has developed quite a tolerance for alcohol.
Again, we find no abuse of discretion and thus no error.[11]
Raleigh also claims that the trial court erred in rejecting Figueroa's life sentences as mitigation. We disagree. The trial court found that
[t]he Co-Defendant, Domingo Figueroa, received two life sentences for the same murders. While this could be a mitigating factor the Court does not find it to be so in this case. As previously pointed out, Raleigh was the principal perpetrator in these killings. Figueroa, while a participant, played a lesser role. So the distinction in the sentences is logical and warranted.
Reasonable people could agree with the trial court's ruling; thus we find no abuse of discretion and no error. See Huff v. State, 569 So.2d at 1249.
Based on the foregoing, we conclude that the first-degree murder convictions are adequately supported by the record and the sentence of death is proportionate.[12] Accordingly, we affirm the convictions and sentence of death.[13]
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW, GRIMES, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] Aggravating circumstances: (1) defendant was convicted of a prior violent felony (Cox and Eberlin); (2) defendant committed the murder while engaged in a burglary (Cox and Eberlin); (3) defendant committed the murder in a cold, calculated, and premeditated manner (Cox); (4) defendant committed the murder to avoid arrest or effect escape (Eberlin); (5) the murder was especially heinous, atrocious, or cruel (Eberlin).
[2] Statutory mitigating circumstance: Raleigh was nineteen at the time of the crime (§ 921.141(6)(g), Fla. Stat. (1995)).
[3] Nonstatutory mitigating factors: defendant (1) was intoxicated; (2) is remorseful; (3) pled guilty; (4) offered to testify against codefendant Figueroa; (5) could probably adjust well to prison life; (6) is a good son and friend to his mother; (7) is a good brother; (8) is a good father figure to ex-girlfriend's daughter; (9) was born into dysfunctional family; (10) did not know who fathered him; (11) attempted suicide; (12) has low self-esteem; (13) suffers from an adjustment disorder and is anti-social; (14) uses poor judgment and engaged in impulsive behavior; (15) is a follower.
[4] Whether the trial court erred by (1) failing to instruct the jury on the "no significant history of criminal activity" statutory mitigator; (2) instructing the jury on the "pecuniary gain" aggravator; (3) failing to give the requested instruction on the "cold, calculated, and premeditated" (CCP) aggravator; (4) dismissing a juror over defense objection, where there was no showing that the juror could not be fair; (5) finding the "during the course of a burglary" aggravator; (6) finding the "avoid arrest" aggravator; (7) finding the CCP aggravator for Cox's murder; (8) finding the "heinous, atrocious, or cruel" (HAC) aggravator for Eberlin's murder; (9) rejecting the "under substantial domination of another" statutory mitigator; (10) rejecting the "no significant history of criminal activity" statutory mitigator; (11) giving only "some weight" to the "remorseful and cooperative with authorities" nonstatutory mitigator; (12) rejecting Figueroa's life sentences as a nonstatutory mitigator; (13) giving "little weight" to Raleigh's voluntary intoxication; and (14) sentencing Raleigh to death, because death is disproportionate.
[5] See Huff v. State, 569 So.2d 1247, 1249 (Fla. 1990) ("Discretion ... is abused only where no reasonable [person] would take the view adopted by the trial court.").
[6] Section 810.02(1), Florida Statutes (1995), states:

(1) "Burglary" means entering or remaining in a dwelling, a structure, or a conveyance with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter or remain.
[7] See Robertson v. State, 699 So.2d 1343 (Fla.1997)(holding that the jury could have concluded that consent to remain was withdrawn when defendant bound and blindfolded the victim and stuffed a brassiere down the her throat).
[8] See Thompson v. State, 648 So.2d 692, 695 (Fla.1994) ("[T]he State must show that the sole or dominant motive for the murder[s] was the elimination of ... witness[es].... [T]his factor may be proved by circumstantial evidence from which the motive for the murder[s] may be inferred.").
[9] See Walls v. State, 641 So.2d 381 (Fla.1994)(explaining the four elements that must exist to establish cold, calculated premeditation).
[10] See, e.g., State v. Dixon, 283 So.2d 1, 9 (Fla.1973)(interpreting the terms heinous, atrocious, and cruel).
[11] See id.
[12] See Gamble v. State, 659 So.2d 242 (Fla. 1995).
[13] We find no merit to issue 3 (requested CCP instruction). Raleigh concedes that the court's instruction from Jackson v. State, 648 So.2d 85, 95 n. 8 (Fla.1994), was correct.